UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

ADVENTIST HEALTH SYSTEM/ )
SUNBELT, INC. )
 )
V. ) NO. 2:10-CV-189
 )
KATHLEEN SEBELIUS, Secretary )
United States Department of Health and )
Human Services )

## **REPORT AND RECOMMENDATION**

Both parties to this suit have filed motions for summary judgment, (Doc. 17, Doc. 19). The district judge has referred these motions to the magistrate judge for a report and recommendation.[1] Disposition by summary judgment is appropriate since the issue is one of law only.

The plaintiff operates two hospitals in Tennessee, one in Greeneville, and one in Madison. These hospitals render medical services to low-income patients. Plaintiff claims that the Department of Health and Human Services (hereafter "federal government") owes it approximately Five Million Dollars for reimbursement for services its hospitals rendered to low-income patients for the years 1995 to 2000.

Under Title XVIII of the Social Security Act, the Medicare program, the federal government reimburses hospitals for certain medical expenses provided to the elderly and

---

[1]Doc. 24.

disabled. Under Title XIX, which is the *Medicaid* program, the federal government financially assists the states in providing medical care to low-income patients. 42 U.S.C. § 1396a sets out the requirements for state Medicaid plans. For a state to receive federal assistance for medical services rendered to low-income individuals, that state must submit a plan for approval by the Secretary of the Department of Health and Human Services.[2] The only state expenditures eligible for matching federal payments are those that are made under a plan approved by the Secretary.[3]

To encourage the states to "experiment" and develop programs to "assist in promoting the objectives" of Medicaid, 42 U.S.C. § 1315 authorizes the Secretary to waive compliance with the general statutory requirements set out in 42 U.S.C. § 1396a for state Medicaid plans:

> **(a) Waiver of State plan requirements; costs regarded as State plan expenditures; availability of appropriations**
>
> In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of [Medicaid] in a State or States –
>
> (1) the Secretary may waive compliance with any of the . . . [general statutory requirements] . . . to the extent and for the period [the Secretary] finds necessary to enable such State or States to carry out such project, and
>
> (2)(A) costs of such project which would not otherwise be included as [Medicaid] expenditures . . ., shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan or plans approved [by the Secretary] . . . .

Tennessee has an experimental or demonstration project, "TennCare." TennCare not

---

[2] 42 U.S.C. § 1396a.

[3] 42 U.S.C. §§ 1315, 1396, 1396c.

only provides for medical assistance to low income individuals who are eligible for Medicaid, it also provides for medical assistance to certain uninsured or uninsurable individuals *who would not otherwise qualify for Medicaid*. This latter group is referred to as an "expansion waiver population," and it lies at the heart of the present litigation.

The Secretary approved TennCare in 1993 in a letter which stated, in part, that payments with respect to expansion populations would be "regarded as expenditures under the State Title XIX (Medicaid) plan."[4]

A hospital is reimbursed for its treatment of Medicare and Medicaid patients under the Prospective Payment System ("PPS").[5] Although payments under PPS are based on a predetermined amount for each patient depending upon that patient's diagnosis at the time of his discharge,[6] the payments can be adjusted upwardly if a hospital serves a disproportionately large number of low-income patients. This increased payment is called the "Disproportionate Share Hospital" adjustment, or "DSH." The 1986 Consolidated Omnibus Budget Reconciliation Act ("COBRA") provides the formula to be used to determine if a hospital is entitled to the DSH adjustment.[7] The formula includes the sum of two fractions. The first fraction – the Medicare fraction – involves a calculation of the number of "patient days" that a hospital utilizes in serving inpatients who are entitled to

---

[4]AR. pp. 80, 179.

[5]42 U.S.C. § 1395ww(d).

[6]42 U.S.C. § 1395ww(d)(1)-(4).

[7]42 U.S.C. § 1395ww(d)(5)(F)(v) and (vi).

Medicare Part A benefits and Supplemental Security Income.

The second fraction, the "Medicaid fraction" and the one relevant to this suit, involves a calculation of a hospital's patient days that a hospital spends serving patients who are eligible for Medicaid. The numerator is the number of the hospital's patient days (for the reporting period) which consists of patients who were eligible for Medicaid, and who are not entitled to benefits under Medicare. The denominator of that fraction is the total number of the hospital's patient days for that reporting period. From a hospital's perspective, the larger the numerator, the higher that hospital's DSH percentage, and the greater its DSH adjustment. Of course, if the numerator is lessened, there will be a concomitant decrease in the DSH adjustment.

The Secretary has contracts with various insurance carriers – "fiscal intermediaries" – across the country to administer the fiscal aspect of the medical program. Before 2000 some intermediaries included expansion populations within the Medicaid fraction, and others did not, including those in Tennessee.[8] As a result of the inconsistent treatment of the expansion populations, in December 1999 the Secretary issued a Program Memorandum A-99-62 entitled "Clarification of Allowable Medicaid Days In The Medicare Disproportionate Share Hospital (DSH) Adjustment Calculation – Action."[9] In this Memorandum, the Secretary stated that a review of the practices and policies regarding the DSH calculation

---

[8] *St. Thomas Hospital v. Sebelius, Secretary*, 705 F.Supp.2nd 905, 909, and 920 (M.D. Tenn. 2010).

[9] AR. p. 217-223.

4

indicated the need for clarification. The Secretary stated that a patient who is not eligible for medical assisted benefits under an approved Title XIX State plan does not generate a "Medicaid day" merely because that patient has "some other association with the Medicaid program."[10]

In January 2000, the Secretary promulgated an interim final rule that addressed the issue of the inclusion of the expansion waiver population within the numerator of the Medicaid fraction:

> Effective with discharges occurring on or after January 20, 2000, for purposes of counting days under paragraph (b)(4)(I) of this section, hospitals may include all days attributable to populations eligible for Title XIX matching payments through a waiver approved under section 1115 of the Social Security Act.[11]

In other words, *after* January 20, 2000, the expansion waiver population was to be included within the numerator of the Medicaid fraction. But with regard to pre-January 20, 2000 policy, the Secretary asserted that "[u]nder current policy . . . [expansion waiver populations] . . . were not to be included in the [numerator of the Medicaid fraction] . . . ."[12]

For the years 1995-2000, this plaintiff's fiscal intermediary did not include the expansion waiver population in the Medicaid fraction, as a result of which plaintiff's Medicaid reimbursement was far less than what it would have been if that expansion waiver population had been included. And thus the dispute: plaintiff argues, on several bases, that

---

[10] AR. p. 218.

[11] 42 C.F.R. § 412.106(b)(4)(ii).

[12] 65 Fd. Reg. 3136 at I(B).

5

the Secretary was required to include the expansion waiver population in the DSH calculation, whereas the Secretary insists that her exclusion of the expansion waiver population from the numerator's fraction is based on her interpretation of the relevant statutes, and that her interpretation is correct.

Judicial review of the Secretary's decision is accomplished pursuant to the "applicable provisions" of the Administrative Procedure Act.[13] The "applicable provision" of the Administrative Procedure Act is 5 U.S.C. § 706(2), which directs the reviewing court to set aside any action or conclusion of the Secretary which the court finds to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; or unsupported by substantial evidence.

There are three cases decided by other courts that address the question now before this court: *Portland Adventist Medical Center, et al. v. Thompson, Secretary*, 399 F.3d 1091 (9th Cir. 2005), which held in favor of the plaintiff hospitals and against the Secretary; *Cookeville Regional Medical Center, et al. v. Leavitt, Secretary*, 531 F.3d 845 (D.C. Cir. 2008), which held in favor of the Secretary and against the plaintiff hospitals; and *St. Thomas Hospital v. Sebelius, Secretary*, 705 F.2d 905, (M.D. Tenn.), which also held in favor of the Secretary and against the plaintiff hospital.[14]

---

[13]42 U.S.C. § 1395oo(f)(1).

[14]Plaintiff filed an *amicus* brief in *St. Thomas*, which district judge Echols considered, albeit hesitantly. As is his customary practice, Judge Echols wrote a thorough and well-reasoned opinion which addresses every issue raised by plaintiff in the case pending before this court.

Plaintiff argues that this court should reverse the Secretary's decision because (1) her decision violates the "plain language" of the Medicaid DSH statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II);[15] and because (2) even if the Secretary had discretion during the relevant period of time to determine which kinds of patients should (and should not) be considered Medicaid patients for inclusion within the numerator of the Medicaid fraction, she nevertheless earlier had determined, without qualification when she approved the Tennessee waiver in 1993, that the expansion population "shall be regarded" as eligible for medical assistance under Title XIX;[16] (3) section 5002 of the Debt Reduction Act of 2005 (hereafter discussed) does not require exclusion of expansion waiver populations from the DSH calculation;[17] and (4) the Secretary's decision is arbitrary and capricious because the Secretary failed to consider plaintiff's arguments and evidence.[18]

## *IS THE MEANING OF THE STATUTE "PLAIN"?*

As ultimately codified, there are two statutes that must be considered together in determining whether or not the composite meaning is indeed "plain." The section that specifies what is to be included within the numerator of "Medicaid fraction" is 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II); that datum is the number of the hospital's patient days "which consists of patients who . . . were eligible for medical assistance under a State plan approved

---

[15] Brief, Doc. 18, p. 15.

[16] Brief, Doc. 18, p. 10.

[17] Brief, Doc. 18, p. 20.

[18] Brief, Doc. 18, p. 23.

7

under subchapter XIX . . . ." The other section is 42 U.S.C. § 1315(a)(2)(A) which specifies that costs attendant to medical care rendered the expansion waiver populations "shall, to the extent and for the period proscribed by the Secretary, be regarded as expenditures under the State plan or plans approved [by the Secretary]."

In *Portland Adventist*, the Ninth Circuit held that Congress had "clearly expressed its intent" that expansion populations be included in the numerator of the Medicaid fraction: 'In the demonstration project statute, Congress expressly tied § 1115 waivers[19] to approved state Medicaid plans by providing that the costs of such demonstration projects 'shall . . . be regarded as expenditures under the State plan.'" 399 F.3d at 1096.

The D.C. Circuit, however, reached the opposite conclusion in *Cookeville Regional*. The district court in Cookeville initially had held for the plaintiff hospitals,[20] determining that the two relevant statutory provisions – 42 U.S.C. § 1395ww(d)(5)(F)(vi) and 42 U.S.C. § 1315(a)(2)(A) – "unambiguously required the Secretary to include the expansion waiver population in the Medicaid fraction," 531 F.3d at 847, and the Secretary appealed. While that appeal was pending, Congress passed the Deficit Reduction Act of 2005. Section 5002 of that Act reads as follows:

> SEC. 5002. CLARIFICATION OF DETERMINATION OF MEDICAID PATIENT DAYS FOR DSH COMPUTATION.

1.

---

[19] I.e., 42 U.S.C. § 1315a(1)(A).

[20] 2005 WL 3276219 (Dist. D.C. 2005).

<< 42 USCA § 1395ww >>

(a) IN GENERAL.—Section 1886(d)(5)(F)(vi) of the Social Security Act (42 U.S.C. 1395ww(d)(5)(F)(vi)) is amended by adding after and below subclause (II) the following:

"In determining under subclause (II) the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under title XIX, the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they receive benefits under a demonstration project approved under title XI.".

(b) RATIFICATION AND PROSPECTIVE APPLICATION OF PREVIOUS REGULATIONS.—

(1) IN GENERAL.—Subject to paragraph (2), regulations described in paragraph (3), insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under title XI of the Social Security Act under section 1886(d)(5)(F)(vi) of such Act, are hereby ratified, effective as of the date of their respective promulgations.

(2) NO APPLICATION TO CLOSED COST REPORTS.—Paragraph (1) shall not be applied in a manner that requires the reopening of any cost reports which are closed as of the date of the enactment of this Act.

(3) REGULATIONS DESCRIBED.—For purposes of paragraph (1), the regulations described in this paragraph are as follows:

(A) 2000 REGULATION.—Regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., including the policy in such regulations regarding discharges occurring prior to January 20, 2000.

(B) 2003 REGULATION.—Regulations promulgated on August 1, 2003, at 68 Federal Register 45345 *et seq*.

Subsection (a) added language to 42 U.S.C. § 1395ww(d)(5)(F)(vi) that was essentially identical to the language already in 42 U.S.C. § 1315a: "the Secretary may, to the extent and for the period the Secretary determines appropriate, include patient days of patients not so eligible but who are regarded as such because they received benefits under

9

a demonstration project approved under Title XI."

Subsection (b) of course ratifies the Secretary's purported policy recited in 65 Fed.Reg. 3136.

The district court reconsidered its ruling in light of the enactment of the Deficit Reduction Act, and it reversed itself, holding that the Act was a valid retroactive change in the law which required a judgment for the Secretary.

On appeal to the D.C. Circuit, the plaintiffs raised three arguments: that the controlling law prior to the Deficit Reduction Act unambiguously compelled the Secretary to include expansion waiver populations in the DSH calculation; that the Deficit Reduction Act that purported to ratify the Secretary's earlier policies was a substantive change in the law that precluded retroactive application; and that the Deficit Reduction Act could not be applied retroactively because Congress did not clearly indicate its intent in this regard. 531 F.3d at 847.

The D.C. Circuit commenced its analysis by stating that the law was not as clear as the Ninth Circuit believed:

> [Plaintiffs'] argument stems from the language providing that the costs of a demonstration project "shall" be regarded as expenditures under subchapter XIX. *See*, 42 U.S.C. § 1315a(2)(A). The statute, however, modifies the "shall" by indicating that the costs are only treated as Medicaid expenditures "to the extent and for the period proscribed by the Secretary." *Id*. While this clearly gives the Secretary control over the duration over the demonstration project, the language may do more. Plausibly, the "to the extent" language is a grant of discretion to the Secretary to determine which costs or how much of the costs are to be treated as expenditures.

531 F.3d at 848.

In a footnote to the last sentence of the foregoing quote, the court stated:

> The House and Senate reports discussing § 1315 lend support to this reading. Both stated that the costs of demonstration projects "could be included, for purposes of such participation, as expenditures under . . . the State plan approved under any of such titles, but only for the period and to the extent prescribed by the Secretary. Senate Rep. 87-1589, at 31 (1962), U.S. Code Cong. & Admin. News 1961, pp. 1943, 1973; H.R. Rep. 87-1414, at 35 (1962).

*Id*.

The District of Columbia Circuit concluded its opinion with these words:

> These considerations lead us to conclude that it was unclear, prior to the Deficit Reduction Act, whether the Secretary had discretion to exclude the expansion waiver population from the proportionate share hospital adjustment. It follows that there is no problem with retroactivity.

*Id*.

The district court in *St. Thomas* reached the same conclusion as the D.C. Circuit: prior to the enactment of the Debt Reduction Act in 2005, "it was, at a minimum, unclear whether the Secretary had discretion to exclude the expansion waiver population from the DSH adjustment." 705 F.Supp.2d at 918.

The analyses of the D.C. Circuit court and the district court for the Middle District of Tennessee require no supplementation by a magistrate judge from the Eastern District of Tennessee. Nevertheless, for the law to be "plain" as plaintiff argues, the words "to the extent and for the period described by the Secretary" must be excised from 42 U.S.C. § 1315a(2)(A), which the court may not do: "It is 'a cardinal principle of statutory

construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal citations omitted).  Therefore, when read with all the other language in that section, and when that section in turn is read in conjunction with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), there exists, at the very least, a question regarding authority of the Secretary to include, or exclude, the expansion waiver population in the DSH calculation.

*ASSUMING THE SECRETARY HAD DISCRETION DURING THE RELEVANT PERIOD OF TIME TO INCLUDE OR EXCLUDE EXPANSION WAIVER POPULATION PATIENT-DAYS FROM THE DSH CALCULATION, IS SHE NEVERTHELESS BOUND BY HER EARLIER DETERMINATION TO TREAT TENNESSEE'S EXPANSION WAIVER POPULATIONS AS ELIGIBLE FOR MEDICAL ASSISTANCE UNDER THE STATE PLAN?*

The thrust of plaintiff's argument is that when the Secretary approved the TennCare waiver, she determined at that same time that the TennCare expansion waiver population would be regarded as eligible for medical assistance under Tennessee's Medicaid State plan. Plaintiff further argues that the Secretary did not qualify her decision by saying that the individuals would be regarded as eligible for Medicaid for some purposes, but not for some other purpose such as inclusion within the DSH calculation.

Plaintiff reads far too much into the Secretary's letter that approved Tennessee's TennCare Demonstration Project.[21]  Certainly this court does not reach the conclusion from this language as does the plaintiff.  Neither did the district court in *St. Thomas*; it flatly

---

[21]The complete letter appears at AR. p. 177-180.

rejected plaintiff's argument. 705 F.Supp.2d at 921.

## *DOES SECTION 5002 OF THE DEBT REDUCTION ACT OF 2005 REQUIRE EXCLUSION OF EXPANSION WAIVER POPULATION PATIENT DAYS FROM THE DSH CALCULATION? AND, IF IT DOES, DOES THE ACT HAVE RETROACTIVE APPLICATION?*

This particular argument is inextricably related to plaintiff's initial or basic argument that the meaning of the statute is "plain." If the meaning is plain, as plaintiff argues, then § 5002 of the Debt Reduction Act of 2005 effected a substantive change in the law which, so plaintiff argues, cannot have retroactive effect. But, as discussed earlier in this report, and in the *Cookeville* and *St. Thomas* opinions, the meaning of the statute is far from plain. As a result, and as *Cookeville* noted, "there is no problem of retroactivity." 531 F.3d at 849. The Act clarified an existing ambiguous law and undertook to ratify the Secretary's prior policy of excluding expansion waiver populations from the DSH calculation. By definition, a "clarification" presupposes an intent for retroactive application, *St. Thomas*, 705 F.Supp.2d at 919. The same logic applies to a "ratification" of the Secretary's policies.

## *WAS THE SECRETARY'S DECISION ARBITRARY AND CAPRICIOUS BECAUSE SHE FAILED TO CONSIDER PLAINTIFF'S ARGUMENTS?*

In reality, this is not a separate theory or argument at all. According to plaintiff's brief, what the Secretary failed to consider was plaintiff's arguments that the plain meaning of the statute required inclusion of expansion waiver days in the DSH calculation, and in any event the Secretary had made an earlier and unqualified determination that Tennessee's expansion population was eligible for medical assistance under the State plan. Each of those arguments has been addressed and need no further discussion.

***DID THE SECRETARY HAVE AN ESTABLISHED POLICY BEFORE 2000 OF EXCLUDING EXPANSION WAIVER POPULATIONS FROM THE DSH CALCULATION? AND, IF THERE WAS SUCH A POLICY, IS ITS APPLICATION PRIOR TO JANUARY 2000 PRECLUDED BECAUSE OF THE SECRETARY'S FAILURE TO PUBLISH IT IN THE FEDERAL REGISTER?***

This argument is advanced in plaintiff's complaint,[22] but not in its motion for summary judgment. Apart from the complaint, this argument does not appear again until the penultimate paragraph of its opposition-reply brief.[23]

Plaintiff argues that there could be no "policy" because the Secretary failed to publish same in the Federal Register as required by 42 U.S.C. § 1395hh(c)(1), which reads as follows:

> **(c) Publication of certain rules; public inspection; changes in data collection and retrieval**
>
> **(1)** the Secretary shall publish in the Federal Register, not less frequenlty than every 3 months, a list of all manual instructions, interpretative rules, statementsof policy, and guidelines of general applicability which –
>
> **(A)** are promulgated to carry out this subchapter, but
>
> **(B)** are not published pursuant to subsection (a)(1) of this section and have not been previously published in a list under this subsection.

However, as subsection (B) above reflects, there is no requirement to publish in the Federal Register a "policy" that already has been published in rule form in the Code of Federal Regulations. As far back as 1994 and each year thereafter, *substantially* similar

---

[22]Complaint, ¶ 78.

[23]Doc. 21, p. 24.

14

language appears in 42 C.F.R. § 412-106 with regard to the DSH calculation:

> Second Computation. The fiscal intermediary determines, for the hospital's cost reporting period, the number of patient days furnished to patients entitled to Medicaid but not to Medicare Part A, and divides that number by the total number of patient days in the same period.[24]

Plaintiff argues that the words "patients entitled to Medicaid" include the expansion waiver population, which of course is a variation of one or more of its other arguments, *viz.*, that the "plain meaning" of the statute requires inclusion of the expansion waiver population in the DSH calculation, or that the Secretary always considered the expansion waiver population to be "Medicaid patients." Those arguments are addressed in *Cookeville*, and even more exhaustively addressed in *St. Thomas*.

## *CONCLUSION*

The Ninth Circuit's decision in *Portland Adventist* is premised on its conclusion that the relevant statute is unambiguous. The D.C. Circuit disagreed with that premise, the district court for the Middle District of Tennessee disagreed, and this court disagrees. *Portland Adventist* was wrongly decided. Conversely, both *Cookeville* and *St. Thomas*[25] are well-reasoned and their conclusion is the correct one.

Notwithstanding inconsistent treatment of expansion waiver populations across the country by fiscal intermediaries, the Secretary had a policy during the years 1995-2000 of

---

[24] 42 C.F.R. § 412106(b)(4). (1994).

[25] According to Pacer, the judgment in *St. Thomas* (3:08-CV-01041), was filed on March 31, 2010, and the plaintiff has not pursued an appeal.

15

*not* including those populations in the numerator of the Medicaid fraction. The Debt Reduction Act of 2005, which undertook to ratify that policy, was intended by Congress to have retroactive effect, and in fact it does.

It is respectfully recommended that defendant's motion for summary judgment (Doc. 19) be granted, and that plaintiff's motion for summary judgment (Doc. 17) be denied.[26]

Respectfully submitted,

                                    s/ Dennis H. Inman
                                United States Magistrate Judge

---

[26] Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).